UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DIANE MADDEN,

                              Plaintiff,

                                                      ORDER
          -against-                                   16-CV-6835(SJF)(AKT)

TOWN OF HEMPSTEAD, ANTHONY SANTINO,
KATE MURRAY, MICHAEL PASTORE, GERRY
MARINO, KEVIN DENNING, GARRETT GORTON
and RAYCHEL RYCKMAN-MARTINO,

                              Defendants.
-----------------------------------------------------------------X
FEUERSTEIN, District Judge:

I.      Introduction

        On December 12, 2016, plaintiff Diane Madden ("plaintiff") commenced this civil rights

action against defendants Town of Hempstead (the "Town"), Anthony Santino ("Santino"), Kate

Murray ("Murray"), Michael Pastore ("Pastore"), Gerald Marino s/h/a Gerry Marino ("Marino"),

Kevin Denning ("Denning") and Garrett Gorton ("Gorton") (collectively, the "Town

Defendants") pursuant to 42 U.S.C. § 1983, alleging that the Town Defendants violated her First

Amendment rights to freedom of speech, access to the government and peaceable assembly and

her Fourteenth Amendment right to equal protection of the laws. On September 18, 2017,

plaintiff filed an amended complaint, *inter alia*, adding Raychel Ryckman-Martino ("Ryckman-

Martino") as a defendant. Pending before the Court is the Town Defendants' motion for

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing

plaintiff's claims in their entirety.[1]  For the reasons set forth below, the Town Defendants'

motion is granted to the extent set forth below.


II.      Background

         A.       Factual Allegations[2]

         Plaintiff resides in East Meadow, New York, which is located in the Town of Hempstead.

(Defendants' Statement of Material Facts pursuant to Local Civil Rule 56.1 ["Def. 56.1"], ¶ 1).

Plaintiff is an animal rights advocate who has been vocal and active in regard to the operations of

the Town of Hempstead Animal Shelter ("TOHAS") and the programs attendant thereto.

(Defendants' Reply to Plaintiff's Counterstatement Pursuant to Local Rule 56.1 ["Def. Reply"],

¶ 156).

---

[1] This action was initially assigned to the Honorable Leonard D. Wexler, former United States District Judge. On April 6, 2018, the action was reassigned to the Honorable Joseph F. Bianco, United States District Judge. On May 2, 2018, the action was reassigned to the undersigned.

[2] Only those assertions in the parties' statements pursuant to Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Civil Rule 56.1") that are properly supported pursuant to Rule 56(c) of the Federal Rules of Civil Procedure have been considered by the Court. *See* Local Civil Rule 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."); *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 305 (S.D.N.Y. 2015) ("[I]f a party fails to properly support a statement by an adequate citation to the record, the Court may properly disregard that assertion."); *F.D.I.C. v. Hodge*, 50 F. Supp. 3d 327, 343, n. 2 (E.D.N.Y. 2014) ("Statements without citation to evidence may be properly ignored by the court."); *Kaur v. New York City Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 322 (S.D.N.Y. 2010) ("Where there are no citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion." (quotations, alterations and citation omitted)). Moreover, only those facts that are material to the disposition of the motions, *i.e.*, that "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), are set forth herein. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) ("The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" (brackets in original) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505). The following facts are undisputed unless otherwise indicated.

The Town is a municipal corporation and political subdivision of the State of New York. (Def. 56.1, ¶ 2). At all relevant times, (i) Murray was the Town Supervisor until January 2016 and Santino was the Town Supervisor from January 2016-2017, (*id.*, ¶¶ 6, 9); (ii) Denning was Santino's executive assistant and the liaison with TOHAS, (*id.*, ¶ 3); (iii) Gorton was the chief investigator with the Town Attorney's Office, (*id.*, ¶ 4; Def. Reply, ¶ 193); (iv) Marino was the Commissioner of General Services for the Town, (Def. 56.1, ¶ 5); (v) Pastore was the director of TOHAS, and reported to Marino and Denning[3], (*id.*, ¶¶ 7-8); and (vi) Ryckman-Martino was a volunteer at TOHAS. (*Id.*, ¶ 10).

Plaintiff does not hold any degrees or certifications in the care, control, custody or medical treatment of domesticated animals, (Def. 56.1, ¶ 11), although she once took a seminar offered at Animal Welfare Association, a local New Jersey organization, related to adoption promotion, (*id.*, ¶ 12), and is aware that as a municipal corporation in the State of New York, the Town is required to maintain an animal control function pursuant to the New York State Agriculture and Markets Laws. (*Id.*, ¶ 13). Section 123 of the Agriculture and Markets Law requires the Town to take into custody dogs that are strays and/or deemed to be dangerous, and prescribes conditions under which municipalities are required to euthanize dangerous dogs, *see* N.Y. Agric. & Mkts. §123; and Sections 117 and 374 provide municipalities with the procedure for the humane destruction of animals, *see Id.* §§117, 374. (Def. 56.1, ¶¶ 14-15). The Town also provides euthanasia services to private citizens who wish to have their pets euthanized. (*Id.*, ¶ 16). Nonetheless, plaintiff believes that TOHAS can be a "no-kill shelter" due to its significant budget and ability to "hire countless amount of people that are professionals that can rehabilitate

---

[3] Pastore replaced Cindy Iacopella ("Iacopella"), who resigned in 2014. (Def. Reply, ¶¶ 166, 177).

animals, that can work with the public to prevent the surrender of animals, that can work with the public who are adopters, who are having problems with animals, and before those animals are surrendered again, to rehabilitate them further." (*Id.*, ¶ 17).

When Murray was the Town Supervisor, she made public comments that TOHAS would be "adoption friendly," (Def. 56.1, ¶ 18), which plaintiff believes means holding more adoption events, promoting adoptions, forming relationships with adoption entities and placing animals into rescue. (*Id.*, ¶ 19).

TOHAS maintains a Facebook page, promotes certain animals and continues to hold adoption events. (Def. 56.1, ¶ 20). During her deposition, plaintiff testified that between 2013 and 2017, she started seeing "an increase in adoptions due to the behavior portion of the [TOHAS]," (Declaration of Donna A. Napolitano, Esq. ["Napolitano Decl."], Ex. Y at 22-23); and "a decline of animals being euthanized." (*Id.*, Ex. Y at 23). The Outcome Summary Report for TOHAS indicates, *inter alia*, that the percentage of adoptions between 2013 and 2017 slightly increased from approximately twenty-three percent (23%) of the total intake of "Unique Animals" to approximately twenty-five percent (25%) thereof, (*see id.*, Ex. E), and that the percentage of animals that were euthanized during that time period declined from approximately fifteen percent (15%) to approximately four percent (4%) of the total intake of "Unique Animals."[4] (*Id.*).

---

[4] Although plaintiff challenges the Outcome Summary Report as "inadmissible hearsay," it may be admissible at trial as an exception to the rule against hearsay pursuant to Rule 803(6) of the Federal Rules of Evidence. Although plaintiff's Local Rule 56.1 Counterstatement ("Plf. 56.1") indicates that plaintiff "believes the information was not recorded correctly[,]" (Plf. 56.1, ¶ 21), the evidence cited in purported support of such contention, *i.e.*, plaintiff's affidavit, does not support that contention. Nowhere in her affidavit does plaintiff even mention the Outcome Summary Report, much less challenge its accuracy. Thus, the only purported support for plaintiff's challenge to the Outcome Summary Report is Pastore's testimony that certain people may have "editing rights" to the computer program at issue, (Napolitano Decl., Ex. CC at 158-160), which, alone, is insufficient to raise a disputed issue of

Pastore met plaintiff after he became employed by the Town in 2014. (Def. 56.1, ¶ 27).

Pastore testified that before he actually met plaintiff, Iacopella told him that plaintiff had filed a

prior lawsuit against the Town[5] and "would come to the shelter but with no specific purpose, just

to take pictures and make records." (Napolitano Decl., Ex. CC at 105). Pastore inquired of

Cheryl Petri ("Petri"), a Deputy Town Supervisor and Denning's predecessor as the Town's

shelter liaison, about permitting plaintiff to take photographs of the animals at TOHAS, (Def.

56.1, ¶ 35), and how he should handle the situation when plaintiff did so "because there didn't

seem to be a specific purpose of coming to the shelter for the services that the shelter offered."

(Napolitano Decl., Ex. CC at 138-139). According to Pastore, "[a]t some point [TOHAS] did

distribute a photo policy . . . to ensure that the animals came across in a good light[,]" but they

"were not able to figure out how to police citizens from coming in to take photos that may have

presented animal [sic] in a bad light, so [they] weren't really able to enforce it anyway." (*Id.* at

140). Pastore testified that he could not recall witnessing any individual take photographs of the

animals at TOHAS other than plaintiff and the volunteers and staff members of TOHAS. (*Id.* at

142-143).

Pastore met with plaintiff at TOHAS sometime in 2014, and again at Town Hall in 2015.

(Def. 56.1, ¶ 33). Although Pastore also saw plaintiff at TOHAS approximately once every

couple of weeks, he would not interact with her. (*Id.*, ¶ 34).

---

fact, particularly in light of plaintiff's testimony essentially corroborating the information, *i.e.*, that adoptions
increased and euthanasia of animals decreased between 2013 and 2017. (*See* Napolitano Decl., Ex. Y at 22-23).

[5] On or about December 8, 2010, plaintiff, along with others, filed a lawsuit against the Town, Murray and others
alleging First Amendment retaliation and other violations of their civil rights. (Am. Compl., ¶ 14). That lawsuit was
resolved by an offer of judgment on or about January 7, 2013. (*Id.*)

Plaintiff openly discussed changes she had observed at TOHAS at Town Board meetings and appeared and spoke at the Town Board meetings on numerous occasions over the years. (Def. 56.1, ¶¶ 23-24; Def. Reply, ¶ 170). Plaintiff testified that Petri was present during the meetings in which she openly discussed the changes she had observed at TOHAS. (Napolitano Decl., Ex. Y at 43-45). Plaintiff would also email Petri, (Def. 56.1, ¶ 26; Def. Reply, ¶ 171), as well as the Town Attorney, Joseph Ra ("Ra"). (Def. 56.1, ¶ 31). Plaintiff made many complaints about Pastore to Petri at the Town Board meetings and in her emails. (*Id.*, ¶ 79). At Murray's request, plaintiff (i) met with Petri and Pastore in an effort to resolve issues about which she publicly spoke at Town Board meetings, (*id.*, ¶ 29), and (ii) met with Ra several times in order to create new legislation in an effort to decrease "puppy mills" doing business in the Town. (*Id.*, ¶ 32).

On approximately six (6) or seven (7) occasions between the period from 2013 to 2017, Ra sought plaintiff out at the Town Board meetings to solicit her views on what was occurring at TOHAS; to respond to something that was said at the Town Board meeting; or to discuss a complaint to which he was responding, something they had spoken about or planned on speaking about, legislation that they were working on together, some expected changes that were going to take place, or FOIL requests he received. (Napolitano Decl., Ex. Y at 75-77).

On August 27, 2015, plaintiff and others held a protest at TOHAS in an effort to replace its leadership. (Def. 56.1, ¶ 37).

Plaintiff visited TOHAS three (3) to four (4) times a month during 2016 and was never prevented from entering the shelter. (Def. 56.1, ¶ 84). Pastore testified that he could not think of any reason why plaintiff should be refused access to TOHAS. (Napolitano Decl., Ex. CC at 140).

Although, as set forth below, plaintiff claims that she was escorted out of TOHAS on February 18, 2017, she was never refused access to TOHAS after that date. (*Id.*, Ex. Y at 192-93, 195). Moreover, the security video recording from TOHAS on February 18, 2017 does not show plaintiff ever being escorted out of TOHAS on that date, (*id.*, Ex. V-1[6]); nor does plaintiff identify any specific details regarding her claim, *e.g.*, who allegedly escorted her out of the building, when they did so, etc.

Plaintiff met with Santino after he was elected as Town Supervisor. (Def. 56.1, ¶ 38). Specifically, plaintiff attended meetings with Santino; Marino; Stephen D'Esposito ("D'Esposito"), Santino's chief of staff; William Mueller ("Mueller"), Santino's counsel; and the secretary for Michael Deery ("Deery"), Santino's communications director, on at least five (5) occasions (the "Santino Meetings"), beginning in the first week of February 2016. (Def. 56.1, ¶¶

---

[6] Plaintiff objects to the security video recording on the grounds that it was not properly authenticated and constitutes inadmissible hearsay. With respect to the former assertion, since plaintiff does not actually challenge the authenticity of the video, merely the lack of proper authentication, and the video may easily be authenticated at trial, *see* Fed. R. Evid. 901, the video may properly be considered on this motion. *See, e.g. Boelter v. Hearst Commc'ns, Inc.*, 269 F. Supp. 3d 172, 202-03 (S.D.N.Y. 2017) (finding that the defendant's argument that a certain exhibit was not properly authenticated was "not compelling," since it did not "challenge the authenticity of the document, but only its admissibility."); *Long v. New York City*, No. 14-cv-9908, 2016 WL 4203545, at * 2, n. 4 (S.D.N.Y. Aug. 8, 2016) ("A party is not required to authenticate documents on a summary judgment motion where [] authenticity is not challenged by the other party." (quotations, alterations and citation omitted)); *Hines v. City of Albany*, No. 1:06-cv-1517, 2011 WL 2620381, at *2, n. 5 (N.D.N.Y. July 1, 2011), *aff'd*, 520 F. App'x 5 (2d Cir. Mar. 29, 2013) ("[O]n a motion for summary judgment, a party is not required to authenticate documents, where, as here, authenticity is not challenged by the other party. . . . Moreover, there is no need to comply with the formal requirement that evidence be authenticated where it is clear that documents submitted by a non-moving party could be produced in admissible form at trial." (citations omitted)).

With respect to plaintiff's latter assertion, the security video recording, which does not contain audio, does not constitute inadmissible hearsay within the meaning of Fed. R. Evid. 801. "Hearsay" is defined as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). "Statement" is defined as "a person's oral assertion, written assertion, or nonverbal conduct, *if the person intended it as an assertion*." Fed. R. Evid. 801(a) (emphasis added). As the video recording merely depicts the events that occurred at TOHAS on February 18, 2017, and nothing therein can be construed as nonverbal conduct which plaintiff, or any other person depicted thereon, intended to be an assertion, it does not constitute a "statement" under Fed. R. Evid. 801(a).

44-45; Def. Reply, ¶ 173). Denning, who succeeded Petri as the liaison to TOHAS, (Def. 56.1, ¶ 30), was also present during all of the Santino Meetings except the first one; and Deery was present at some of the Santino Meetings. (Napolitano Decl., Ex. Y at 53-54). Although Santino had initially wanted to meet every two (2) weeks, the meetings actually occurred about once a month until mid-2016. (Def. 56.1, ¶ 46). Plaintiff testified that all of the Santino Meetings related to the operations of TOHAS. (Napolitano Decl., Ex. Y at 54).

At the first Santino Meeting, which lasted approximately forty-five (45) minutes, Santino told plaintiff that he wanted to "reset the relationship" and to get her input and suggestions regarding TOHAS. (Def. 56.1, ¶¶ 47, 51). Plaintiff testified that during that meeting, "the primary issue" that was discussed "was the leadership and the problems that had occurred since . . . Pastore[] took over the Animal Shelter[,]" and that "[s]econd to that was the issue of the lack of a behavior department and qualified behaviorist." (Napolitano Decl., Ex. Y at 54-55).

Denning testified that during the first Santino Meeting he attended, "overall issues with the shelter, ones that concerned [plaintiff]" were discussed, and they may have also discussed plaintiff's suggestions of promoting a reading program and removing Pastore as director of TOHAS. (Napolitano Decl., Ex. Z at 48-49). Indeed, plaintiff suggested the removal of Pastore as the director of TOHAS at every Santino Meeting. (Def. 56.1, ¶ 62). According to plaintiff, Pastore "referred to the Shelter's animals as 'inventory,' and the potential adopters as 'civilians[,]' . . . [and] unabashedly mocked and provoked animal advocates such as [her]self, and any person involved with the shelter who had similar views." (Affidavit of Diane Madden ["Plf. Aff."], ¶ 4). However, since Pastore holds a civil service position whose title is specific to the shelter, reassigning him would be very difficult. (Def. 56.1, ¶ 63).

Denning also testified that "[t]here would be certain suggestions that [he] would have to take care of[,]" (Napolitano Decl., Ex. Z at 50); that one suggestion that came up during one of the Santino Meetings was "putting back of [sic] [Dolores] Stormo's desk in her office," (*id.* at 51); and that Santino directed him "to take care of it," which he did. (*Id.*).

At the second Santino Meeting, there was a discussion of the TOHAS leadership, lack of a qualified behaviorist and other problems that had arisen since the first meeting, including TOHAS's official Facebook page and failure to promote shelter animals. (Def. 56.1, ¶¶ 52-53). Plaintiff asked Santino to add one (1) or perhaps two (2) other administrators on the Facebook page to resolve any issues with events not being posted and to consider either giving the part-time staff of TOHAS more hours or making them full-time. (*Id.*, ¶¶ 54-55).

The third Santino Meeting, which Deery did not attend, occurred in April 2016. (Def. 56.1, ¶ 56). At that meeting, plaintiff discussed the "cage cards," which are the cards attached to the animal cages containing an identifying picture of the animal and background information, and "issues" she had with the TOHAS employee who was the acting behaviorist, including complaints by the volunteers and some of the staff at TOHAS about that individual's mishandling of animals. (*Id.*, ¶¶ 57-59).

During the last two Santino Meetings, plaintiff "brought many issues to Santino's attention" and spoke freely about her concerns. (Def. 56.1, ¶ 60).

After six (6) months of meetings, plaintiff advised Santino that she would no longer participate in any further meetings. (Def. 56.1, ¶ 64).

In addition to the Santino Meetings, Plaintiff also met with Denning approximately four (4) times prior to Town Board meetings. (Def. 56.1, ¶ 39). In addition, plaintiff and Denning

toured another animal shelter for approximately six (6) hours in an effort to try and improve the conditions at TOHAS. (*Id.*, ¶ 40). During that tour, plaintiff and Denning reviewed the physical facilities of the shelter and its policies and procedures, including its behavior department, volunteer program and rescue operations. (*Id.*).

In or around February 2016, Denning; plaintiff; Lucille Defina ("Defina"); Elizabeth Stein ("Stein"), plaintiff's attorney; and Denning's secretary, Terry Sciarotta, attended a meeting during which general overall issues regarding TOHAS were discussed and Defina provided Denning with a folder regarding the cats. (Def. 56.1, ¶¶ 41-42). Denning followed up at TOHAS with Pastore and other staff members regarding the concerns expressed by plaintiff and Defina during that meeting. (*Id.*, ¶ 43).

During one of her meetings with Denning, plaintiff discussed the appointment of a TOHAS employee to the position of behaviorist and advised Denning that she did not feel this employee was qualified for that position. (Def. 56.1, ¶ 50; Napolitano Decl., Ex. Z at 56).

Denning testified that as the shelter liaison, "[i]f something needed to be done [he] would direct [it][,]" (Napolitano Decl., Ex. Z at 69), so, for example, "[i]f there was a suggestion where [plaintiff] brought something to [his] attention regarding an in-field visit with the constituents where it was being sort of not being permitted to go ahead, [he] felt we would be able to make it happen, got the okay in the Town Attorney's office . . . and did it." (*Id.*, at 70).

Plaintiff emailed Santino multiple times to complain about Pastore, (Def. 56.1, ¶ 66); and had a brief conversation with Pastore in his office and in kennel 3 at TOHAS regarding animal designations. (*Id.*, ¶ 67). In addition, plaintiff spoke many times at Town Board meetings about her concerns regarding animal designations and reputable rescue organizations not being

approved to do rescues with TOHAS, (*id.*, ¶¶ 68-69), and expressed her concern about Pastore's

hiring to Ra at a Town Board meeting. (*Id.*, ¶ 72).

The Town Board meets twice each month and plaintiff's practice was to attend both

meetings throughout the period from 2013 to 2017 and to speak on issues related to TOHAS

each time. (Def. 56.1, ¶ 70). Plaintiff spoke at Town Board meetings concerning (i) a six (6)-year

old shepherd mix that was surrendered to TOHAS and which she observed in a TOHAS office in

a crate with a blanket; (ii) her objections to Pastore's use of the terms "inventory" and/or "stock"

in reference to the animals in TOHAS; (iii) her objections to the "Owner Surrender Euthanasia"

forms; (iv) her belief that Laura Garber ("Garber"), an animal behaviorist hired by Murray, was

being harassed by Pastore; and (v) her concerns that another employee replaced Garber. (*Id.*, ¶¶

74-78). Prior to Iacopella's resignation, plaintiff spoke publicly at Town Board meetings

regarding her dissatisfaction with the manner in which Iacopella operated TOHAS. (*Id.*, ¶ 71).

In May 2016, after plaintiff alleged that she had a confrontation or interaction with

Cynthia Gomez ("Gomez"), a TOHAS employee, in one of the kennel areas (the "Gomez

Incident"), Denning reviewed security video footage of the shelter "to see what may have

happened there." (Napolitano Decl., Ex. Z at 31). However, since there were no cameras in the

kennel area where the incident allegedly occurred, he could not see if any confrontation or

interaction had occurred; the only thing he could see was the camera in the hallway. (*Id.* at 31-

32). Denning testified that he did not recall talking to anyone else about the Gomez Incident, and

that he did not know "who may have, [nor] what other person may have been there." (*Id.* at 32).

On the same day in May 2016, plaintiff also alleged that, Cynthia Raven ("Raven"), a

TOHAS volunteer, harassed her while she was at the shelter (the "Raven Incident"). (Def. 56.1, ¶

86). Specifically, plaintiff testified that Raven took photographs of her at the shelter, "gave [her] the finger," "point[ed] her camera in [plaintiff's] face," "was saying crude curse words" and "jumped around [her], jumped up and down, [and] made a scene." (Napolitano Decl., Ex. Y at 161-166, 169). Following the Raven Incident, (i) plaintiff complained to Acting Assistant Director Christine Giuliani ("Giuliani"); (ii) Stein, plaintiff's attorney, contacted Mueller and requested a copy of TOHAS's security video recordings from that day, (*id.*); and (iii) plaintiff emailed Stein, Mueller and Denning to advise them that any investigation by the Town into the incident would be "wasting valuable time" and would be "senseless." (*Id.*, ¶ 87).

Denning provided a copy of the video recording regarding the Raven Incident to Mueller. (Def. 56.1, ¶ 89). Mueller advised Stein, *inter alia*: (i) that the Town had preserved the video but did not know how to provide them with a copy of it, and (ii) that he agreed that plaintiff should not be bullied while present at TOHAS. (Napolitano Decl., Ex. N and Ex. Y at 171).

Gorton took over the responsibility of investigating complaints about TOHAS from another Town employee in August or September of 2016. (Def. Reply, ¶ 194; Napolitano Decl., Ex. AA at 48). Gorton testified that when he took over the position, he reviewed the one (1) pending investigation regarding TOHAS, which "stemmed from a complaint that animals were being mistreated." (Napolitano Decl., Ex. AA at 52-53). Gorton did not know who filed that complaint. (*Id.* at 54). According to Gorton, his predecessor "led the investigation and . . . wrote up a questionnaire with approximately ten questions to ask each individual employee, supervisor and volunteer their thoughts in what [was] going on, if they witnessed any dogs being injured or if they had any problems with the supervisors, or something to that effect." (*Id.*). Gorton personally interviewed "[p]robably less than ten" people as part of that investigation, and he did

not interview plaintiff. (*Id.* at 54-55). Gorton did not know if anybody else from his office ever interviewed plaintiff. (*Id.* at 55).

Gorton testified that "most of the time" he takes notes during an investigation, which he usually saves in his briefcase. (Napolitano Decl., Ex. AA at 31). According to Gorton, "[i]f the investigation warrants further review by, say, for instance, the district attorney or anywhere that may need Rosario material in that situation, [he] would hand everything over . . . ." (*Id.* at 31-32).

On or about August 29, 2016, plaintiff was again at TOHAS when another volunteer, William Nussbaum ("Nussbaum"), *inter alia*, took a picture of her (the "Nussbaum Incident"). (Def. 56.1, ¶ 91; Def. Reply, ¶ 189). Plaintiff reported the incident to Ra via email, which she copied to Santino and Mueller. (Def. 56.1, ¶ 92).

 After Gorton was assigned to investigate the Nussbaum Incident, he sent plaintiff an email advising her that he wanted to interview her regarding the incident. (Def. 56.1, ¶ 93). Stein responded to Gorton's email on plaintiff's behalf, indicating that she was plaintiff's attorney and requesting a time to meet. (*Id.*, ¶ 94). Gorton emailed Stein on September 8, 2016 requesting that she contact him to schedule a meeting. On that same date, Santino and other members of the Town Board kicked off a "reading program" at TOHAS. (Def. 56.1, ¶ 103). During that event, plaintiff and others held a protest at TOHAS. (*Id.*, ¶ 104; Def. Reply, ¶ 176).

Gorton first met plaintiff at the TOHAS reading event. (Def. 56.1, ¶ 28; Napolitano Decl., Ex. AA at 58-59, 61-62). According to Gorton, he was at that event "as part of the investigation into the animal shelter that day," "probably" with the intent of "questioning more people" since his office "had to work around [the volunteers'] schedule somewhat." (Napolitano Decl., Ex. AA

at 59-60). In describing the nature of his interaction with plaintiff that day, Gorton testified, "[Plaintiff] was out there with several other protesters holding several signs . . . and somebody pointed her out to [him.] [He] went over to her and [they] met, [they] shook hands and [they] started discussing the investigation." (*Id.* at 61). Gorton believed it was a public safety officer who pointed plaintiff out to him. (*Id.* at 63). Gorton further testified that after he introduced himself to plaintiff, "she basically said that 'You're part of the gang and the cronies and you can't have an open mind about this investigation.'" (*Id.* at 66). According to Gorton, he "became a little upset because [he] said, 'You're imputing [sic] my integrity, you never gave me the opportunity, I never met you before.'" (*Id.* at 66-67). Gorton never spoke with plaintiff after that interaction. (*Id.* at 67).

Plaintiff testified that she described Gorton in the amended complaint as "an enforcer for the Town," (Am. Compl., ¶ 39), because during their "initial conversation," Gorton "started making threats at [her], he started – he began by telling [her] that he was looking into [her] background and he was looking into the prior lawsuit and he was looking into [her] activities and what [she] had done to animals at the Animal Shelter. And he threatened that [she] [was] toying with being sued and that [she] made the Shelter an unsafe work environment. . . ." (Napolitano Decl., Ex. Y at 187). When asked why she perceived Gorton's comments about looking into the background of her prior lawsuit and her involvement with TOHAS to be a threat, plaintiff responded, "Because he said he was looking into me personally. He was looking into me personally." (*Id.*, ¶ 188). Plaintiff also testified that Gorton said that there were complaints about her, "[t]o which [she] was not surprised." (*Id.*, ¶ 189). Indeed, many TOHAS employees and volunteers have made complaints about plaintiff, (Def. 56.1, ¶ 154), and Gorton advised plaintiff

that there were individuals at TOHAS who were complaining about her and that he was going to be investigating those complaints. (*Id.*, ¶ 99).

Gorton was also aware of complaints filed with the Town by plaintiff that were in his office for investigation. (Def. 56.1, ¶ 153). At no time did Gorton discuss with the Town Attorney's Office the possibility of restraining plaintiff from TOHAS. (*Id.*, ¶ 155).

Gorton again emailed Stein on September 16, 2016 requesting that she contact him to schedule a meeting, but Stein responded by indicating that his email was "threatening;" that "she would not tolerate being given an ultimatum;" that the tone of his email was "hostile and aggressive;" and that his use of "military time [was] quite telling" as to how he would conduct the investigation. (Def. 56.1, ¶¶ 95-96). Stein did not provide a date or time to meet with Gorton, (*see id.*, ¶ 96), and plaintiff never met with Gorton to discuss the Nussbaum Incident, or at any time after "he threatened."[7] (Napolitano Decl., Ex. Y at 182; Ex. AA at 65-66). Gorton nonetheless investigated the Nussbaum Incident by conducting a telephone interview with Nussbaum. (*Id.*, Ex. S).

Plaintiff attended the January 10, 2017 Town Board meeting. (Def. 56.1, ¶ 105). Early in the meeting, plaintiff spoke with respect to an item on the Town Board's Administrative Calendar. (*Id.*, ¶ 106). During the public comment period of the meeting, Defina refused to leave the speaker's table at the conclusion of the permitted five (5)-minute speaking allotment. (*Id.*, ¶ 107). Nonetheless, Santino called the next speaker to the table, who forfeited her turn, and then called plaintiff to speak. (*Id.*, ¶ 108). When plaintiff, like the speaker called before her, did not

---

[7] Contrary to the assertion in plaintiff's Rule 56.1 counterstatement, nowhere in plaintiff's affidavit does she state that she "was advised by her attorney not to speak to Gorton without [Stein] present, a condition Gorton found unacceptable." (Plf. 56.1, ¶ 97).

step up to speak after Santino had called her name multiple times, Santino declared that plaintiff had also forfeited her right to speak and called the next person waiting to speak. (Napolitano Decl., Ex. U)[8]. Despite her protestations, plaintiff was not permitted to speak thereafter at that meeting. (*Id.*)

On February 18, 2017, there was an incident at TOHAS involving, *inter alia*, Ryckman-Martino (the "Ryckman-Martino Incident"). (Napolitano Decl., Ex. Z at 75-76). According to plaintiff, during a kitten foster event at TOHAS, Ryckman-Martino "started handing out a personal notebook, instructing everyone to give over their personal information," but Dolores Stormo ("Stormo") collected the notebook and said: (i) that "according to Town policy . . . she could not allow for private information for private citizens who came to an event just to have their addresses shared at this event in a private notebook," and (ii) that "if they were interested, to please sign in and to certainly apply for fostering or volunteering." (*Id.*, Ex. Y at 203-204). Plaintiff testified that Ryckman-Martino then "made some comments that this is no longer going to be a problem after today, that she would not be here . . . ." (*Id.* at 204). According to plaintiff, she believed that Ryckman-Martino's comments referred to both Stormo and herself because "just prior to that [plaintiff] had alerted Ms. Stormo to being recorded . . . secretly recorded." (*Id.*). Plaintiff further testified that after the event was over, she "walked back in the room, and this was following [Stormo] and Barbara Thomas, and [she] could see there was some kind of . . . . disagreement among them. And when [she] walked into the room [Ryckman-Martino] literally

---

[8] Contrary to plaintiff's contention, the audio recordings of the Town Board meetings do not constitute inadmissible hearsay, as they are not proffered to prove the truth of the statements asserted therein. *See* Fed. R. Evid. 801(c)(2). Specifically, the audio recording of the January 10, 2017 Town Board Meeting is offered to demonstrate what occurred during the public comment period of the meeting; not for the truth of any of the assertions made therein. In any event, since plaintiff's statements constitute opposing party statements under Fed. R. Evid. 801(d)(2), they are not hearsay.

screamed, [']I'm being cornered, somebody help me,['] and . . . started flailing and flipping out. And [plaintiff] said, [']You're not being cornered.[']"[9] (*Id.* at 205). According to plaintiff, two other women, "Liz" and Bonnie Zerillo, who she identified as another volunteer, were also present during the Ryckman-Martino Incident. (*Id.* at 205-206).

After the police and public safety were called, Melissa Fogarty called Marino and asked him to come to TOHAS because "everybody was upset." (Def. 56.1, ¶¶ 113-114). Marino then went to TOHAS "to secure the location [and] make everybody calm down." (*Id.*, ¶ 116). Upon his arrival at TOHAS, Marino observed two (2) police cars and two (2) public safety cars, Ryckman-Martino in tears and everybody "in a panic" and yelling. (*Id.*, ¶¶ 117-118). Marino spoke with Ryckman-Martino about the incident. (*Id.*, ¶ 115).

Although plaintiff testified that she was escorted out of the shelter on the date of the incident, (Napolitano Decl., Ex. Y at 195), the security video recording from TOHAS on that date does not support that claim. (*Id.*, Ex. V-1). Rather, the video recording shows, *inter alia*, (i) plaintiff walking with a woman defendants identify as Barbara Ann Thomas ("Thomas"), a TOHAS volunteer, in a hallway at TOHAS at approximately 3:37 p.m.; (ii) plaintiff and Thomas are then joined by Nancy Giris, a TOHAS employee; Stormo, a former TOHAS employee; and Wendy Cariello, a former TOHAS employee, and the group stands together in the hallway, laughing; (iii) plaintiff and the others then exit TOHAS on their own accord at approximately 3:40 p.m., and they remain in and around the front entrance; (iv) public safety officers and Nassau County police officers enter and exit the building, and stop and speak with the group

---

[9] In her amended complaint, plaintiff asserts, *inter alia*, that Ryckman-Martino "attempted to antagonize [her], Stormo and others. When confronted by Plaintiff, [Ryckman-]Martino claimed to be 'cornered'." (Amended Complaint ["Am. Compl."], ¶ 51). Plaintiff was then escorted from the building. (*Id.*).

several times, from approximately 3:40 p.m. to 5:50 p.m.; and (v) at 5:55 p.m., after approximately two (2) hours and ten (10) minutes of standing in and around the front entrance and parking area of TOHAS, plaintiff enters her vehicle and drives away. (Napolitano Decl., Ex V-1; Affidavit of Michael Pastore in Support of Town Defendants' Motion for Summary Judgment ["Pastore Aff."], ¶ 18). According to Pastore, TOHAS closed at 6:00 p.m. that day. (Pastore Aff., ¶ 24).

Plaintiff filed a complaint with the Town's Public Safety after the Ryckman-Martino Incident, (Def. 56.1, ¶ 125), and Denning was made aware of the incident when another executive assistant called him. (*Id.*, ¶ 127). Andrew Torlincasi investigated the incident on behalf of the Town, pursuant to which he interviewed twenty (20) witnesses who were present at TOHAS on the date of the Ryckman-Martino Incident and reviewed the video and audio footage of TOHAS for that day. (Napolitano Decl., Ex. W).[10]

At no time after the Ryckman-Martino Incident, did anyone at the Town direct plaintiff not to return to TOHAS. (Def. 56.1, ¶ 126).

During the September 5, 2017 Town Board meeting, which lasted approximately nine (9) hours, plaintiff spoke fifteen (15) times during the Administrative Calendar portion of the meeting. (Def. 56.1, ¶ 148).

Plaintiff was politically active in her goal to get the current Town Supervisor, Laura Gillen, elected in 2017. (Def. 56.1, ¶ 83).

Plaintiff has a Facebook page entitled "Hope for Hempstead" and regularly posts about

---

[10] This exhibit can also be found as exhibit 1 to the Town Defendants' motion to file document under seal (Docket Entry 72-1). Contrary to plaintiff's contention, the investigative report does not constitute inadmissible hearsay, as it is not being considered for the truth of the matters asserted therein, but for the fact of the investigation.

TOHAS. (Def. 56.1, ¶ 81). Plaintiff also regularly posts about TOHAS on her personal Facebook account. (*Id.*, ¶ 82). In addition, plaintiff made "many statements to the press," which no one at the Town prevented. (*Id.*, ¶ 100).

Plaintiff testified that Ryckman-Martino posted certain comments under her personal name and profile on a Facebook site she formerly administered, "Long Island Dog Pounds," and that she has "no way of knowing," and no evidence to establish, that Ryckman-Martino was working at the direction or control of anybody else with respect to those comments. (Napolitano Decl., Ex. Y at 209-10). Plaintiff acknowledges that private citizens have the right to exercise their First Amendment rights via Facebook postings, even if said postings criticize herself or others. (Def. 56.1, ¶ 102).

The Town Board has the authority to hire full-time employees at TOHAS, (Def. 56.1, ¶ 133), but part-time employees are hired by the individual department without Town Board approval. (*Id.*, ¶ 134). Marino has the authority to transfer employees that work in departments that are within the Department of General Services, and within those departments only. (*Id.*, ¶ 135). Pastore does not have the authority to hire staff at TOHAS or to transfer staff out of TOHAS. (*Id.*, ¶¶ 136-137).

Marino was made aware of plaintiff's suggestion regarding an animal behaviorist while at a Town Board Meeting, (Def. 56.1, ¶ 138), and he discussed it with Santino right before the Town issued a request for proposal ("RFP") for a behaviorist. (*Id.*, ¶ 139). There were two (2) RFPs for a behaviorist because Marino considered plaintiff's input regarding the qualifications needed for a behaviorist and included an additional certificate requirement in the second RFP. (*Id.*, ¶¶ 140-142).

Christie Fanti ("Fanti") and Charlene Sorrentino were interviewed for the behaviorist position by a committee consisting of Mueller, Albina Kataeva, Marino, Denning and D'Esposito. (Def. 56.,1 ¶ 143). Marino, as one of the five committee members, recommended Fanti, (*id.*, ¶ 144), and the committee made a recommendation to the Town Board. (*Id.*, ¶ 145). However, the Town Board was ultimately responsible for hiring the behaviorist and it approved hiring Fanti as the TOHAS behaviorist. (*Id.*, ¶¶ 146-147).

Plaintiff has complained about the TOHAS budget. (Def. 56.1, ¶ 149). Marino has heard complaints made about Pastore at Town Board meetings from plaintiff, Defina and a number of volunteers, and has investigated those complaints. (*Id.*, ¶¶ 150-151). Marino has also investigated complaints made by plaintiff, Defina and others regarding the euthanasia rate at TOHAS. (*Id.*, ¶ 152).

Plaintiff does not have any faith or trust in the investigations performed by the Town, and in one instance her complaint was referred to the Nassau County District Attorney's Office. (Def. 56.1, ¶ 80).

B.      Procedural History

On December 12, 2016, plaintiff commenced this action against the Town Defendants pursuant to 42 U.S.C. § 1983, alleging violations of her First Amendment rights to freedom of speech, access to the government and peaceable assembly and her Fourteenth Amendment right to equal protection. On September 18, 2017, plaintiff filed an amended complaint, *inter alia*, adding Ryckman-Martino as a defendant.[11] The Town Defendants now move for summary

---

[11] Plaintiff filed a first amended complaint on June 21, 2017, but subsequently withdrew that pleading. (*See* Docket entries 37, 43 and 44).

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing plaintiff's claims in their entirety.

III.    Discussion

A.  Standard of Review

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Zaretsky v. William Goldberg Diamond Corp.*, 820 F.3d 513, 519 (2d Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted); *see Ricci v. DeStefano*, 557 U.S. 557, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) (holding that "[o]n a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (emphasis added) (internal quotations and citation omitted)); *Vermont Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 142 (2d Cir. 2014) ("The role of the court on a summary judgment motion is to determine whether, as to any material issue, a genuine factual dispute exists." (quotations and citation omitted)). On a motion for summary judgment, "[a] fact is material if it 'might affect the outcome of the suit under the governing law[.]'" *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505).

In reviewing the record to determine whether there is a genuine issue for trial, the court must "construe the evidence in the light most favorable to the nonmoving party," *Dalberth v.*

*Xerox Corp.*, 766 F.3d 172, 182 (2d Cir. 2014) (quotations and citation omitted), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Smith v. County of Suffolk*, 776 F.3d 114, 121 (2d Cir. 2015) (quotations and citation omitted); *accord Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 59 (2d Cir. 2016). "An issue of fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Dalberth*, 766 F.3d at 182 (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505); *see also Apotex*, 823 F.3d at 59. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci*, 557 U.S. at 586, 129 S. Ct. at 2677 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); *accord Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015).

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (quotations, brackets and citation omitted); *see also Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "[W]hen the moving party has carried its burden[,] . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . [,]" *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (quoting *Matsushita Elec.*, 475 U.S. at 586-87, 106 S. Ct. 1348), and must offer "some hard evidence showing that its version of the events is not wholly fanciful[.]" *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (quotations and citation omitted). The nonmoving party can only defeat summary judgment "by adduc[ing] evidence on which the jury could reasonably find for that party." *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56 (2d Cir. 2012)

(quotations, brackets and citation omitted). "'The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient' to defeat a summary judgment motion[,]" *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505); and "[a] court cannot credit a plaintiff's merely speculative or conclusory assertions." *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012); *see also Fabrikant*, 691 F.3d at 205 ("[C]onclusory statements or mere allegations will not suffice to defeat a summary judgment motion." (quotations and citation omitted)). Since "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party[,] . . . [i]f the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505 (quotations and citations omitted).

Summary judgment is warranted, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *accord El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2187, 198 L. Ed. 2d 255 (2017); *see also Crawford*, 758 F.3d at 486 ("[W]here the nonmoving party will bear the burden of proof on an issue at trial, the moving party may satisfy its burden [of showing the absence of a genuine dispute as to any material fact] by pointing to an absence of evidence to support an essential element of the nonmoving party's case[.]" (quotations, alterations and citation omitted)). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23, 106 S. Ct. 2548; *accord Crawford*, 758 F.3d at 486; *see also Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011) ("Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment.") "The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548. Accordingly, when "the burden of persuasion at trial would be on the non-moving party . . . the party moving for summary judgment may satisfy his burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quotations and citation omitted).

      1.  Affidavits

"Materials submitted in support of or in opposition to a motion for summary judgment must be admissible themselves or must contain evidence that will be presented in admissible form at trial." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169-70 (2d Cir. 2014) (quotations and citation omitted); *see also Lyons*, 681 F.3d at 57 ("In ruling on a motion for summary judgment, the district court may rely on any material that would be admissible at a trial." (quotations and citation omitted)). "[W]here a party relies on affidavits or deposition testimony

24

to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso*, 691 F.3d at 230 (quoting Fed. R. Civ. P. 56(c)(4)); *see* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.") "Where an affidavit or declaration contains material that does not comply with Rule 56(c)(4), a Court may either disregard or strike it from the record." *Russo v. Estee Lauder Corp.*, 856 F. Supp. 2d 437, 443 (E.D.N.Y. 2012); *see also Pace v. Air & Liquid Sys. Corp.*, 171 F. Supp. 3d 254, 272 (S.D.N.Y. 2016) ("A court may strike portions of an affidavit that are not based upon an affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements." (quotations and citation omitted)). Where an affidavit is "more akin to an adversarial memorandum than a *bona fide* affidavit, . . . a court may, in considering a motion for summary judgment, simply decline to consider those aspects of . . . [the] affidavit that do not appear to be based on personal knowledge or are otherwise inadmissible." *Smeraldo v. City of Jamestown*, 512 F. App'x 32, 34 (2d Cir. Feb. 21, 2013) (summary order) (quotations and citations omitted); *accord Serrano v. Cablevision Sys. Corp.*, 863 F. Supp. 2d 157, 163 (E.D.N.Y. 2012); *see also M.V.B. Collision, Inc. v. Allstate Ins. Co.*, 728 F. Supp. 2d 205, 209 (E.D.N.Y. 2010) ("[A]lthough a court certainly cannot consider inadmissible evidence contained in an affidavit submitted in opposition to a summary judgment motion, the Court is not obligated to engage in the time-consuming, cumbersome process of formally striking such evidence in a line-by-line fashion. . . . Instead, a court may decline to conduct a line-by-line analysis and [] simply disregard the allegations that are not

properly supported." (quotations, alterations and citations omitted)). Accordingly, any assertions in plaintiff's and Pastore's affidavits that do not comply with Rule 56(c)(4) of the Federal Rules of Civil Procedure have been disregarded by the Court.

However, "[t]he test for admissibility of a summary judgment affidavit 'is whether a reasonable trier of fact could believe the witness had personal knowledge[,]'" *Super Express USA Publ'g Corp. v. Spring Publ'g Corp.*, No. 13-cv-2813, 2017 WL 1274058, at *6 (E.D.N.Y. Mar. 24, 2017) (quoting *Serrano*, 863 F. Supp. 2d at 163), and "an affiant is under no obligation to specify the source of his personal knowledge." *Bank of Am., N.A. v. Kamico, Inc.*, No. 11-cv-5255, 2012 WL 1449185, at *5 (S.D.N.Y. Apr. 24, 2012). "The lack of certain specific details or arguably vague statements will not render the affidavit inadmissible, but affect the weight and credibility of the testimony, which have to be determined by the trier of fact at trial." *Serrano*, 863 F. Supp. 2d at 163.

Since a reasonable trier of fact could believe that Pastore, as the director for TOHAS since 2014, would have personal knowledge about, *inter alia*, the number, maintenance, location and recording-capacity of the video cameras at TOHAS; the conversations he had with others regarding the Ryckman-Martino Incident; the staff members, volunteers and regular attendees of TOHAS during his tenure; and the shelter's operating hours, Pastore's affidavit satisfies Fed. R. Civ. P. 54(c)(4) with respect to those issues. *See, e.g. Klein v. Torrey Point Grp., LLC*, 979 F. Supp. 2d 417, 432 (S.D.N.Y. 2013); *Shannon v. New York City Transit Auth.*, 189 F. Supp. 2d 55, 66 (S.D.N.Y. 2002), *aff'd*, 332 F.3d 95 (2d Cir. 2003).

Moreover, "an affiant may testify as to the contents of records she reviewed in her official capacity." *Searles v. First Fortis Life Ins. Co.*, 98 F. Supp. 2d 456, 461 (S.D.N.Y. 2000);

*accord Zakre v. Norddeutsche Landesbank Girozentrale*, 396 F. Supp. 2d 483, 504 (S.D.N.Y. 2005). Accordingly, Pastore's assertions regarding the contents of TOHAS's video security recording, which he reviewed in his official capacity as the director of TOHAS, are admissible.

Furthermore, although plaintiff identified sixty-one (61) witnesses who may possess knowledge and/or information pertaining to the claims in this case in her initial disclosures pursuant to Fed. R. Civ. P. 26, she never identified Defina as a witness. Rule 37(c)(1) of the Federal Rules of Civil Procedure provides, in relevant part, that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." In determining whether to preclude evidence pursuant to Fed. R. Civ. P. 37(c)(1), the court considers: "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (quotations, alterations and citation omitted).

Since, *inter alia*, plaintiff has not offered any explanation, much less a compelling justification, for her failure to identify Defina as required by Fed. R. Civ. P. 26; Defina's affidavit is generally cumulative and would not affect the Court's determination of the motion; defendants would be prejudiced by the lack of an opportunity to depose Defina, and obtain any additional information that may have resulted therefrom, prior to their submission of the summary judgment motion; and this action is currently at the summary judgment stage, *see Wu v. Metro-North Commuter R.R. Co.*, No. 14-cv-7015, 2016 WL 5793971, at * 9 (S.D.N.Y. Aug.

27

4, 2016) ("[t]he close of discovery counsels strongly against the granting of a continuance"), Defina's affidavit is stricken from the record and has not been considered by the Court. *See, e.g. Xiao Hong Zheng v. Perfect Team Corp.*, 739 F. App'x 658, 662 (2d Cir. June 26, 2018) (summary order) (finding that the district court did not abuse its discretion in striking from the summary judgment record, *inter alia*, affidavits from non-party witnesses who were not properly disclosed as required by Fed. R. Civ. P. 26 where defendants "offered no compelling explanation for their noncompliance."); *Haas v. Delaware & Hudson Ry. Co.*, 282 F. App'x 84, 86-87 (2d Cir. June 24, 2008) (summary order) (finding that the district court "did not exceed its allowable discretion" in striking from the summary judgment record an affidavit pursuant to Fed. R. Civ. P. 37(c)(1)).

    B.  First Amendment Claims

The amended complaint alleges, *inter alia*, (i) that the Town Defendants violated plaintiff's First Amendment rights and/or Fourteenth Amendment equal protection rights: (A) by "seeking to chill [her] as a taxpaying citizen for [sic] speaking out on matters of public concern and from access to public facilities . . . " (first cause of action), (Am. Compl., ¶ 58), (B) by "attacking [her] for continuing to perform her volunteer work" in purported retaliation for her commencement of a previous lawsuit against the Town (second cause of action), (*id.*, ¶ 61), and (C) by retaliating against her for "her constitutionally protected activities in free assembly" (third cause of action), (*id.*, ¶ 63); and (ii) that the Town Defendants and Ryckman-Martino (collectively, "defendants") violated plaintiff's First Amendment rights and/or Fourteenth

Amendment equal protection rights by retaliating against her for her commencement of the instant lawsuit (fourth cause of action). (*Id.*, ¶ 65).

            1.   Freedom of Speech, Access to Government and Peaceable Assembly Claims

The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. "The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental." *De Jonge v. Oregon*, 299 U.S. 353, 364, 57 S. Ct. 255, 81 L. Ed. 278 (1937).

However, "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 799-800, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985). "[T]he government is permitted to exercise control over the public's use of government-owned property for expressive purposes, and the degree of control permitted depends upon the nature of the property and the speech restrictions imposed thereon." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 341 (2d Cir. 2010) (quotations and citation omitted); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983) ("The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue.")

The Supreme Court has recognized "three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums." *Minnesota Voters Alliance v. Mansky*, --- U.S. ---, 138 S. Ct. 1876, 1885, 201 L. Ed. 2d 201 (2018); *see also Johnson v. Perry*, 859 F.3d 156, 171 (2d Cir. 2017) ("[S]peech restrictions imposed on persons on government-owned property are analyzed under a 'forum-based' approach that divides government property into three principal categories—the traditional public forum, the designated public forum, and the nonpublic forum[.]" (quotations, alterations and citation omitted)). "The level of judicial scrutiny that must be applied to state actions inhibiting speech varies with the nature of the forum in which the speech occurs, . . . and the same analytical framework applies whether the First Amendment right being exercised is speech . . . or other 'expressive activity' such as assembly. . . ."*Johnson*, 859 F.3d at 171 (quotations, alterations and citations omitted).

In both traditional public forums, *e.g.*, parks, streets, sidewalks, and the like, and designated public forums, *i.e.*, "spaces that have not traditionally been regarded as a public forum but which the government has intentionally opened up for that purpose[,]" *Mansky*, --- U.S. ---, 138 S. Ct. at 1885 (quotations and citation omitted), "the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited."[12] *Id.* "In a nonpublic forum, on the other hand—a space that is not by tradition or designation a forum for public communication—the government has much more flexibility to craft rules limiting speech." *Id.* (quotations and citation omitted). "The government may reserve such a forum for its

---

[12] However, the strict scrutiny standard is only applicable to the designated public forum for "so long as the state continues to designate the forum for such use[;] . . . the government may decide to close a designated public forum." *Johnson*, 859 F.3d at 172.

intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* (quotations and citation omitted); *see also Johnson*, 859 F.3d at 172 (holding that in a nonpublic forum, "content regulations are allowed if they are reasonable and viewpoint-neutral." (quotations and citation omitted)). The Supreme Court "employs a distinct standard of review to assess speech restrictions in nonpublic forums because the government, no less than a private owner of property, retains the power to preserve the property under its control for the use to which it is lawfully dedicated." *Mansky*, --- U.S. ---, 138 S. Ct. at 1885 (quotations and citation omitted).

In addition, the "limited public forum" is recognized as "a subset of the designated public forum." *Johnson*, 859 F.3d at 171. "A limited public forum is created when the State opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Id.* at 172 (quotations and citation omitted); *see also Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470, 129 S. Ct. 1125, 172 L. Ed. 2d 853 (2009) ("The Court has also held that a government entity may create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects.") As in a nonpublic forum, "in a limited public forum, regulations governing the content of speech are allowed, so long as they are 'reasonable' and 'viewpoint-neutral.'" *Johnson*, 859 F.3d at 172; *see also Pleasant Grove*, 555 U.S. at 470 (holding that in a limited public forum, "a government entity may impose restrictions on speech that are reasonable and viewpoint neutral.")

"Accordingly, the initial task of a court faced with a dispute regarding First Amendment activity on government property is to define the nature of the property at issue." *Zalaski*, 613

F.3d at 341. "In conducting forum analysis, [courts] examine a variety of factors, including the forum's physical characteristics and the context of the property's use, including its location and purpose." *Id.* at 342 (quotations and citation omitted). "[T]he primary factor in determining whether property owned or controlled by the government is a public forum is how the locale is used[,]" *id.* (quotations and citation omitted), although "the government's intent in constructing the space and its need for controlling expressive activities on the property, as evidenced by its policies or regulations[,]" is also relevant. *Id.* In addition, the court should "consider whether the property in question is part of a class of property which by history or tradition has been open and used for expressive activity." *Id.* (quotation and citation omitted).

Plaintiff's First Amendment freedom of speech, access to government and peaceable assembly claims are premised upon the Town Defendants' conduct in (i) refusing to allow her to speak during the public comment period of the January 10, 2017 Town Board meeting; and (ii) allegedly having her removed from TOHAS on February 18, 2017. With respect to the former claim, a public meeting of an elected municipal board, such as the January 10, 2017 Town Board meeting, is considered to be a limited public forum. *See, e.g. Weinberg v. Village of Clayton, N.Y.*, No. 5:17-cv-0021, 2018 WL 5777292, at * 7 (N.D.N.Y. Nov. 2, 2018) ("Village Board meetings are deemed to be a limited public forum."); *Smith v. City of Middletown*, No. 3:09-cv-1431, 2011 WL 3859738, at * 4 (D. Conn. Sept. 1, 2011), *aff'd sub nom Smith v. Santangelo*, 518 F. App'x 16 (2d Cir. May 1, 2013) ("Numerous courts have held that city council meetings which have been opened to the public are limited public fora. . . . [T]he public comment period during the Council meeting [also] constitute[s] a limited public forum."); *Malta v. Slagle*, No. 05-cv-342S, 2007 WL 952045, at * 3 (W.D.N.Y. Mar. 29, 2007) ("[C]ourts have generally held

that a public meeting of an elected municipal board . . . is a limited public forum for the purposes of First Amendment analysis.")

Even viewing the evidence in the light most favorable to plaintiff, Santino's conduct in ruling that plaintiff (and the speaker called immediately before her) forfeited the right to speak during the public comments period of the January 10, 2017 Town Board meeting after failing to approach the speaker's table when called to do so multiple times, was viewpoint neutral and a reasonable restriction necessary to maintain, or regain, order at the meeting. *See, e.g. Arnold v. Ulatowski*, No. 5:10-cv-1043, 2012 WL 1142897, at * 4-5 (N.D.N.Y. Apr. 4, 2012); *Devine v. Village of Port Jefferson*, 849 F. Supp. 185, 190 (E.D.N.Y. 1994). The record is bereft of any evidence from which a rational jury may reasonably find that Santino, or any of the other defendants, refused to let plaintiff speak at the meeting because of the content of her anticipated speech. Indeed, plaintiff was permitted to speak at every other Town Board meeting both before and after the January 10, 2017 meeting, and was even allowed to speak earlier in the meeting on January 10, 2017. In addition, other individuals were allowed to speak against TOHAS and Pastore during the public comments period of the January 10, 2017 meeting, (*see* Ex. U), and there is nothing in the record from which it may reasonably be inferred that defendants' conduct in refusing to allow plaintiff to speak "advocate[d] a particular opinion or viewpoint or suppress[ed] any group's ideas." *Hansen v. Town of Smithtown*, 342 F. Supp. 3d 275, 291 (E.D.N.Y. 2018).

Moreover, the Town clearly "had a significant interest in conducting its meeting in an orderly and effective fashion," *Devine*, 849 F. Supp. at 190; *accord Brenchley v. Village of Phoenix*, No. 5:01-cv-190, 2005 WL 2437027, at *4 (N.D.N.Y. Sept. 30, 2005), and Santino's

conduct was a reasonable response to Defina's disruptive behavior, the protests and shouting that

ensued as a result thereof, and plaintiff's failure to approach the speaker's table after her name

was called multiple times. Accordingly, the Town Defendants have established their entitlement

to judgment as a matter of law with respect to plaintiff's First Amendment free speech, access to

government and peaceable assembly claims relating to the January 10, 2017 Town Board

meeting.

       With respect to plaintiff's First Amendment claims relating to her purported removal

from TOHAS on February 18, 2017, at most, TOHAS would be a limited public forum.[13] *See,*

*e.g. Hansen*, 342 F. Supp. 3d at 291-92 (applying the judicial scrutiny standard applicable to a

limited public forum to a volunteer orientation held at the Town of Smithtown's animal

shelter[14]). Plaintiff's purported removal from TOHAS was both (i) viewpoint neutral, as the

record is devoid of any evidence from which a rational jury may reasonably find that plaintiff

was escorted or removed from TOHAS because of the content of any expressive conduct or

speech in which she engaged;[15] and (ii) a reasonable restriction necessary to maintain order in

the shelter, as it is undisputed that there was some type of confrontation between Ryckman-

Martino, a TOHAS volunteer, and plaintiff within the shelter immediately prior to plaintiff's

---

[13] It is clear that TOHAS is neither a traditional public forum nor a designated public forum. *See, e.g. Hansen*, 342 F. Supp. 3d at 289 (holding that the Town of Smithtown's animal shelter was not a traditional or designated public forum). Since the same level of judicial scrutiny is applicable to both nonpublic forums and limited public forums, it is unnecessary to determine whether TOHAS constitutes a nonpublic forum or a limited public forum.

[14] The plaintiff in *Hansen* also claimed, as plaintiff does here, that she was removed from a volunteer event being held at a municipal animal shelter on February 18, 2017, albeit for different reasons. *Hansen*, 342 F. Supp. 3d at 284, 288.

[15] Indeed, plaintiff does not even allege that she was engaged in any expressive conduct while at TOHAS on February 18, 2017, much less that she was removed from TOHAS as a result of such conduct.

purported removal therefrom. Accordingly, the Town Defendants have established their entitlement to judgment as a matter of law with respect to plaintiff's First Amendment freedom of speech, access to government and peaceable assembly claims relating to her alleged removal from TOHAS on February 18, 2017. *See, e.g. Moore v. U.S. Postal Serv.*, 159 F. App'x 265, 267 (2d Cir. Dec. 14, 2005) (summary order) ("Since the First Amendment does not guarantee access to property simply because it is owned or controlled by the government, . . . and the 'no entry' order was based upon [the plaintiff's] disruptive behavior—not because of the content or viewpoint of [his] speech or expressive activities—the order limiting [the plaintiff's] access to that nonpublic forum [the post office] was a reasonable restriction." (quotations and citations omitted)). Therefore, the branches of the Town Defendants' motion seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing plaintiff's First Amendment freedom of speech, access to government and peaceable assembly claims is granted and the Town Defendants are granted judgment as a matter of law dismissing plaintiff's First Amendment freedom of speech, access to government and peaceable assembly claims (first and third causes of action) in their entirety with prejudice.

### 2. Retaliation Claims

To prevail on a First Amendment retaliation claim, the plaintiff must prove: "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). With respect to the injury element, the plaintiff must show "either that his speech has been adversely affected by the

government retaliation or that he has suffered some other concrete harm." *Id.* (emphasis omitted).

"Where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech." *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001). Since defendants' alleged retaliation did not curtail plaintiff's speech, *e.g.*, she continually engaged in protests at TOHAS, to speak at Town Board meetings, to regularly post about TOHAS on social media and to be politically active, plaintiff cannot establish that her speech was adversely affected by defendants' allegedly retaliatory conduct. Moreover, no rational factfinder could find from the record evidence that plaintiff suffered any other concrete harm as a result of defendants' conduct. Initially, plaintiff does not even allege, much less establish, that she was removed from TOHAS on February 18, 2017 as a result of any expressive conduct. Nor is there any evidence in the record from which a rational factfinder may reasonably infer that plaintiff's alleged removal from TOHAS on that date was motivated or substantially caused by her exercise of a First Amendment right.

While plaintiff alleges that her reputation and standing in the community have been damaged, she has not proffered any evidence in support of those conclusory claims. *See, e.g. Maco v. Baldwin Union Free Sch. Dist.*, 249 F. Supp. 3d 674, 679-80 (E.D.N.Y. 2017), *aff'd*, 726 F. App'x 37 (2d Cir. Mar. 7, 2018) (granting the defendants' motion for summary judgment with respect to the plaintiff's First Amendment retaliation claim where she alleged only that her reputation and standing in the community was damaged, but failed to adduce any evidence in support of that claim). "Hurt feelings or a bruised ego are not by themselves the stuff of constitutional tort." *Zherka v. Amicone*, 634 F.3d 642, 645-46 (2d Cir. 2011). "Retaliatory insults

or accusations may wound one's soul, but by themselves they fail to cross the threshold of measurable harm required to move government response to public complaint from the forum of free speech into federal court." *Id.* at 646.

Similarly, plaintiff's conclusory allegations of emotional and psychological harm, anxiety, intimidation and harassment are insufficient to withstand summary judgment. *Cf. Zherka*, 634 F.3d at 646-47 (finding that the plaintiff's allegations of emotional and psychological harm, which were pled "in a most cursory fashion," were insufficient even to satisfy the more lenient facial plausibility standard applicable to a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure); *McNaughton v. De Blasio*, No. 14-cv-221, 2015 WL 468890, at * 11 (S.D.N.Y. Feb. 4, 2015), *aff'd*, 644 F. App'x 32 (2d Cir. Mar. 22, 2016) (holding that conclusory allegations of harassment and stalking were insufficient to state a plausible First Amendment retaliation claim); *Longinott v. Bouffard*, No. 11-cv-4245, 2012 WL 1392579, at * 4 (S.D.N.Y. Apr. 17, 2012) (holding that conclusory allegations of harassment and intimidation were insufficient to state a concrete harm). The case cited by plaintiff, *Vaher v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404 (S.D.N.Y. 2013), is inapposite, as the plaintiff in that case alleged various injuries other than harassment and intimidation, including harm to his professional reputation, temporary modification of his job responsibilities and economic and pecuniary loss. *Id.* at 431-432. No such injuries are alleged, much less established, by plaintiff. Accordingly, the branch of the Town Defendants' motion seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing plaintiff's First Amendment retaliation claims is granted and defendants are granted judgment as a matter of law dismissing

plaintiff's First Amendment retaliation claims (second, third and fourth causes of action) in their entirety with prejudice.

C. Equal Protection Claims

"The Equal Protection Clause 'is essentially a direction that all persons similarly situated should be treated alike.'" *Lanning v. City of Glens Falls*, 908 F.3d 19, 29 (2d Cir. 2018) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)). "Although 'equal protection jurisprudence has typically been concerned with governmental classifications that affect some groups of citizens differently than others . . . [,] an equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out." *Id.* (quoting *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 601, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008)). "To state an equal protection claim based on a theory of selective enforcement, a plaintiff must plausibly allege[] . . . that he was treated differently from other similarly situated individuals[,]" *id.*; and "that such selective treatment was based on impermissible considerations such as [] the exercise of constitutional rights[.]" *Berg v. Kelly*, 897 F.3d 99, 113 (2d Cir. 2018) (quotations, alterations and citation omitted); *accord Brown v. City of Syracuse*, 673 F.3d 141, 151-52 (2d Cir. 2012) (quotations and citation omitted).

In addition, the Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d

1060 (2000). "To establish a class-of-one claim, a plaintiff must show an extremely high degree of similarity between itself and its comparators." *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 198 (2d Cir. 2019) (quotations and citation omitted); *accord Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018). Thus, "to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Progressive Credit*, 889 F.3d at 49 (quotations and citation omitted); *accord Fahs Constr. Grp., Inc. v. Gray*, 725 F.3d 289, 292 (2d Cir. 2013).

Plaintiff premises her equal protection claims upon defendants' refusal to allow her to speak during the public comments period of the January 10, 2017 Town Board meeting and Pastore's promulgation of the "no photo" policy at TOHAS in 2015. (*See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 20). However, plaintiff has not identified a single comparator with respect to either claim, much less one who was treated differently than she was under sufficiently similar circumstances. Indeed, with respect to the January 10, 2017 Town Board meeting, plaintiff was treated in exactly the same manner as the speaker who was called before her, *i.e.*, both were held to have forfeited their right to speak when they failed to approach the speaker's table after their names were called multiple times.

With respect to the "no photo" policy, the record evidence indicates, *inter alia*, that although TOHAS "distribute[d] a photo policy[,] . . . [they] were not able to figure out how to

police citizens from coming in to take photos that may have presented animal [sic] in a bad light, so [they] weren't really able to enforce it anyway." (Napolitano Decl., Ex. CC at 140). Indeed, plaintiff does not even allege, much less establish, that the policy was ever enforced, selectively or otherwise, against her. To the contrary, plaintiff testified that no one has ever stopped her from taking photographs at TOHAS. (*Id.*, Ex. Y at 163-64). Pastore testified that there was only one "example" of the policy being enforced of which he knew, *i.e.*, when a volunteer at TOHAS "was taking pictures and creating postcards and . . . placing them on the front counter," and Pastore told her that they "needed better pictures." (*Id.*, Ex. CC at 143-44). Accordingly, the branch of the Town Defendants' motion seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing plaintiff's Fourteenth Amendment equal protection claims is granted and defendants are granted judgment as a matter of law dismissing plaintiff's Fourteenth Amendment equal protection claims (first, second and fourth causes of action) in their entirety with prejudice.

    D. *Monell* Claims

    Since plaintiff has not established an underlying constitutional violation, her *Monell* claims against the Town necessarily fail. *See Lanning*, 908 F.3d at 30; *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). Accordingly, the branch of the Town defendants' motion seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing plaintiff's Section 1983 claims against the Town is granted and the Town is granted

judgment as a matter of law dismissing plaintiff's Section 1983 claims against it in their entirety with prejudice.[16]

IV.    Conclusion

For the reasons set forth above, the Town Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is granted to the extent set forth herein and defendants are granted judgment as a matter of law dismissing plaintiff's claims against them in their entirety with prejudice. The Clerk of the Court shall enter judgment in favor of defendants and close this case.

SO ORDERED.

_____/s/_____
Sandra J. Feuerstein
United States District Judge

Dated:  March 29, 2019
        Central Islip, New York

---

[16] In light of this determination, it is unnecessary to consider the Town defendants' remaining contentions seeking summary judgment dismissing plaintiff's claims in this action.